## ADOPTION OF MARLENE.

Essex. December 6, 2004. - February 17, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Statute,* Construction. *Parent and Child,* Child support, Care and protection of minor. *Adoption,* Care and protection. *Public Policy.*

This court concluded that the filing of a voluntary consent to adoption under G. L. c. 210, § 2, did not terminate a parent's obligation of child support, where the plain language of the statute said nothing and implied nothing concerning the termination of a parent's support obligations; where, to the extent there was any ambiguity in the effect of G. L. c. 210, § 2, the resolution of that ambiguity was informed by the fact that the Legislature was unlikely to have relieved a biological parent of the existing duty of support by inference; and where such an interpretation of G. L. c. 210, § 2, rendered it a consistent part of the statutes concerning adoption and the deeply entrenched public policy on the subject of child support. [497-501]

PETITION filed in the Essex County Division of the Juvenile Court Department on February 6, 2003.

A motion for child support was heard by *Leslie A. Donahue,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Deborah Sirotkin Butler* for the father.

*Virginia A. Peel* for Department of Social Services.

*Brigid Kennedy-Pfister* for the child.

COWIN, J. In this case, we consider the effect of a parent's consent to adoption on that parent's duty to support his or her child. The child involved here, whom we shall call Marlene, was the subject of a care and protection petition, and after her attorney petitioned for child support on her behalf, her father voluntarily consented to her adoption under G. L. c. 210, § 2. A judge in the Juvenile Court granted the child's motion for

support, and the father appealed from that order, arguing that a
§ 2 consent to adoption terminates the entire parent-child
relationship, including the parent's obligation to support the
child. We granted the father's application for direct appellate
review. We conclude that a parent's consent to adoption of his
or her child under G. L. c. 210, § 2, does not terminate the
parental duty to support the child.

*Facts.* The facts underlying this appeal are not in dispute. On
February 6, 2003, the Department of Social Services (depart-
ment) filed a care and protection petition, see G. L. c. 119,
§ 24, seeking temporary custody of Marlene.[1] The basis for the
petition was alleged physical abuse of Marlene by her father.
One week later, the father waived his right to a hearing to
contest the award of temporary custody. Shortly thereafter, a
Juvenile Court judge awarded temporary custody of Marlene to

---

[1] General Laws c. 119, § 24, states in part:

"The divisions of the juvenile court department, upon the petition
under oath of a person alleging on behalf of a child under the age of 18
within the jurisdiction of the court that the child: (*a*) is without neces-
sary and proper physical or educational care and discipline; (*b*) is grow-
ing up under conditions or circumstances damaging to the child's sound
character development; (*c*) lacks proper attention of the parent, guard-
ian with care and custody or custodian; or (*d*) has a parent, guardian or
custodian who is unwilling, incompetent or unavailable to provide any
such care, discipline or attention, may issue a precept to bring the child
before the court, shall issue a notice to the department and summonses
to both parents of the child to show cause why the child should not be
committed to the custody of the department or that any other appropri-
ate order should not be made. . . . If, after a recitation under oath by
the petitioner of the facts of the condition of the child who is the
subject of the petition, the court is satisfied that there is reasonable
cause to believe that the child is suffering from serious abuse or neglect
or is in immediate danger of serious abuse or neglect and that immedi-
ate removal of the child is necessary to protect the child from serious
abuse or neglect, the court may issue an emergency order transferring
custody of the child to the department or to a licensed child care agency
or individual . . . . A transfer of custody shall be for a period not
exceeding 72 hours except that upon the entry of the order, notice shall
be given to either or both parents, guardian with care and custody or
other custodian to appear before the court. The court shall, at that time,
determine whether temporary custody shall continue until a hearing on
the merits of the petition for care and protection is concluded before the
court."

her stepsister. Marlene was later placed in a "Planned Permanency Living Arrangement."[2] Adoption was never sought for Marlene, and the department's original plan was reunification between the father and the child.

The issue of support for the child developed as follows. On March 14, 2003, after Marlene was placed in the temporary custody of her stepsister, the child, by her attorney, moved for an order, pursuant to G. L. c. 119, § 28,[3] for child support from her father.[4] On March 18, 2003, the father signed an adoption surrender that complied with the requirements of G. L. c. 210, § 2, which provides that a parent can consent to the adoption of his or her child, and waive all right to further notice of proceedings involving the child's custody, guardianship, adoption, or other disposition.[5] The statute also contains the wording for the

---

[2]The term "Planned Permanency Living Arrangement" appears in the docket, but is not defined by the parties or by the care and protection statute, G. L. c. 119. We assume that this phrase refers to the living situation of the child pursuant to a permanency plan filed by the department with the Juvenile Court. See G. L. c. 119, § 29B.

[3]The relevant portion of G. L. c. 119, § 28 (a), provides: "During the pendency of an action brought pursuant to section twenty-four, temporary orders providing for the support of a child may be entered. The court may thereafter enter a judgment against the party chargeable with support."

General Laws c. 119, § 28 (b), states in part that "[a]ctions under this section to establish support of a child may be commenced by a parent, whether a minor or not; by the child; by the child's guardian, next of kin or other person standing in a parental relationship to the child; [or] by the authorized agent of the department . . . ."

[4]The child also moved for support from her mother but, due to the mother's indigency, later withdrew the motion.

[5]The statute provides in part:

> "A decree of adoption shall not be made, except as provided in this chapter, without the written consent of the child to be adopted, if above the age of twelve; of the child's spouse, if any; of the lawful parents, who may be previous adoptive parents, or surviving parent; or of the mother only if the child was born out of wedlock and not previously adopted. A person whose consent is hereby required shall not be prevented from being the adoptive parent. . . . A copy of said consent shall be filed with the department of social services. A consent executed in accordance with the provisions of this section shall be final and irrevocable from date of execution."

form by which a parent consents to adoption,[6] and the form the father signed was in the statutory language. In accordance with the statutory mandate "[a] copy of said consent [was] filed with the department." See G. L. c. 210, § 2. Although nothing in the statute requires a court filing, on April 8, 2003, the father filed a copy of the adoption surrender with the court. Concerned about a lack of authority to order child support after a voluntary surrender, the judge declined to order support from the father.

On June 19, 2003, the judge reversed herself and allowed the child's motion for support, requiring the father "to file a financial statement with probation and to pay [c]hild [s]upport consistent with the Child Support Guidelines." The judge later issued findings of fact and conclusions of law in support of her order, holding that a § 2 consent could not relieve the father of his child support obligations. The father appealed from the order, and child support proceedings were stayed pending resolution of this issue.

*Discussion.* We have not had occasion to determine whether the filing of a voluntary consent to adoption under G. L. c. 210, § 2, terminates a parent's obligation of child support. In interpreting § 2, we look first to the language of the statute. "[S]tatutory language is the principal source of insight into legislative purpose." *Local 589, Amalgamated Transit Union* v. *Massachusetts Bay Transp. Auth.*, 392 Mass. 407, 415 (1984), quoting *Bronstein* v. *Prudential Ins. Co.*, 390 Mass. 701, 704 (1984). When the words of a statute are clear, they are to be given their ordinary and natural meanings. *Bronstein* v. *Prudential Ins. Co., supra*, citing *Hashimi* v. *Kalil*, 388 Mass. 607, 610

---

[6]The form of the consent, set forth in the statute, reads in relevant part:

"I, as the (relationship) of (name of child), age ___, of the ___ sex, born in (place of birth), on (date of birth), do hereby voluntarily and unconditionally surrender (child) to the care and custody of (agency or person receiving custody) for the purpose of adoption or such other disposition as may be made by a court of competent jurisdiction. I waive notice of any legal proceeding affecting the custody, guardianship, adoption or other disposition of (child).

"I UNDERSTAND THAT THIS SURRENDER IS FINAL AND CANNOT BE REVOKED.

/s/ (person giving consent)."

(1983). If the meanings are unclear, the statute must be interpreted "according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Telesetsky* v. *Wight*, 395 Mass. 868, 872 (1985), quoting *Commonwealth* v. *Galvin*, 388 Mass. 326, 328 (1983). In addition, "a statute should be read as a whole to produce an internal consistency." *Telesetsky* v. *Wight, supra* at 873.

Section 2 does not mention the word "support," and makes no reference to any other section that addresses the topic. Hence, any relationship between § 2 and a parent's duty to support exists only by inference. The father asks us to infer that the Legislature intended that the language of § 2 terminate this statutory obligation. We decline to do so.

In interpreting § 2, we start from the proposition that parents have a preexisting obligation to support their children. This duty to support "has existed by statute in some form since as early as 1692." *T.F.* v. *B.L.*, 442 Mass. 522, 532 (2004), citing *Commonwealth* v. *Chase*, 385 Mass. 461, 469 (1982), and Province Laws 1692-1693, c. 18, § 5. Over time, the Legislature has created a comprehensive statutory system governing child support, imposing that obligation on any parent who acknowledges paternity or is adjudicated to be the father. See *T.F.* v. *B.L., supra* at 532 (duty to support minor child is statutory and longstanding). This responsibility is imposed by several statutes. See, e.g., G. L. c. 119A, § 1; G. L. c. 208, § 28; G. L. c. 209, § 37; G. L. c. 209C, § 9. Our cases have acknowledged as much. See *T.F.* v. *B.L., supra*; *L.W.K.* v. *E.R.C.*, 432 Mass. 438, 443 (2000). Thus, when a parent consents to adoption of a child under § 2, such consent must be viewed in terms of the preexisting duty of support toward that child.

Section 2 says nothing and implies nothing concerning the termination of a parent's support obligations. The statutory consent form is very limited and precise. It states that the parent "voluntarily and unconditionally surrender[s] (child) to the care and custody of (agency or person receiving custody) for the

purpose of adoption or such other disposition as may be made by a court of competent jurisdiction." It also provides for a "waive[r] [of] notice of any legal proceeding affecting the custody, guardianship, adoption or other disposition of (child)." G. L. c. 210, § 2. The form has two effects. First, the parent grants to the specified agency or person custody of the child and consent to "adoption or such other disposition" of the child. Second, the parent thereby waives the right to notice of any legal proceeding that affects the "custody, guardianship, adoption or other disposition" of the child. This consent to custody and adoption and accompanying waiver of notice surrender important parental rights, but only those specific rights.

To the extent there is any ambiguity in the effect of § 2, resolution of that ambiguity is informed by the fact that the Legislature is unlikely to have relieved a biological parent of the existing duty of support by inference. Had the Legislature intended that § 2 have any impact beyond its stated terms, it could have done so by specifying what consequence signing the form would have on a parent's obligations. Cf. G. L. c. 210, § 6 (decree of adoption ends all "rights, duties and other legal consequences" of natural parents). In the absence of any indication of such legislative intent, we do not read such an effect into this section. "We will not add words to a statute that the Legislature did not put there, either by inadvertent omission or by design." *Commonwealth* v. *Callahan*, 440 Mass. 436, 443 (2003), quoting *Commonwealth* v. *McLeod*, 437 Mass. 286, 294 (2002), and cases cited. See *Civitarese* v. *Middleborough*, 412 Mass. 695, 700 (1992) ("We will not read into the plain words of a statute a legislative intent that is not expressed by those words"). The various support statutes and § 2 are unrelated, and reading the section more broadly than its explicit terms allow is inappropriate. "The law of adoption is purely statutory . . . and the governing statute, G. L. c. 210 . . . , is to be strictly followed in all its essential particulars." *Adoption of Tammy*, 416 Mass. 205, 210 (1993).

The father contends that a legislative intent that the § 2 surrender should end all parental obligations to the child is evidenced by the following language in the § 2 form, "I UNDERSTAND THAT THIS SURRENDER IS FINAL AND

CANNOT BE REVOKED." G. L. c. 210, § 2. These words (as well as another statutory reference to the final and irrevocable nature of the consent) mean only that the surrender is final as to the enumerated rights being surrendered. The finality of that surrender does not expand the scope of what is thereby surrendered, nor does it transform the surrender into a document terminating the responsibilities of the parent.

Our interpretation of the statute renders it a consistent part of the statutes concerning adoption. "We ordinarily construe statutes to be consistent with one another." *Green* v. *Wyman-Gordon Co.*, 422 Mass. 551, 554 (1996). "Statutes addressing the same subject matter clearly are to be construed harmoniously so as to give full effect to all of their provisions and give rise to a consistent body of law." *Ciardi* v. *F. Hoffmann-La Roche, Ltd.*, 436 Mass. 53, 62 (2002), citing *Green* v. *Wyman-Gordon Co., supra*. See *St. Germaine* v. *Pendergast*, 411 Mass. 615, 626 (1992). "A basic tenet of statutory construction requires that a statute 'be construed so that effect is given to all its provisions, "so that no part will be inoperative or superfluous." ' " *Wolfe* v. *Gormally*, 440 Mass. 699, 704 (2004), quoting *Bankers Life & Cas. Co.* v. *Commissioner of Ins.*, 427 Mass. 136, 140 (1998).

General Laws c. 210, § 6, which provides for decrees of adoption, states: "If the court is satisfied . . . that the child should be adopted, it shall make a decree, by which, except as regards succession to property, all rights, duties and other legal consequences of the natural relation of child and parent shall thereafter exist between the child and the petitioner and his kindred, and *such rights, duties and legal consequences shall, except as regards marriage, incest or cohabitation, terminate between the child so adopted and his natural parents . . .*" (emphasis added). The termination of "duties and legal consequences" in § 6 clearly ends a parent's duty of support on adoption. To read § 2 as also terminating the parent-child relationship and concomitant duty of support would be to render the highlighted language of § 6 superfluous in any case where adoption resulted after a parent gave consent pursuant to § 2. Such a reading would not produce a harmonious result, and would fail to give effect to an important provision of the adop-

tion statute. We do not read one section of a statute as negating another.

The father's reading of § 2 conflicts with deeply entrenched public policy on the subject of child support. The child support scheme in Massachusetts furthers two important goals: "(1) providing for the best interests of children, and (2) ensuring that the taxpayers are secondary to the parents in meeting the financial needs of dependent children." *Department of Revenue* v. *Mason M.*, 439 Mass. 665, 669 (2003). See *Boulter-Hedley* v. *Boulter*, 429 Mass. 808, 812-813 (1999), citing G. L. c. 119A, §§ 1, 13 (*c*); G. L. c. 208, § 28; Child Support Guidelines. See also G. L. c. 209C, § 9 (*c*). The father's interpretation of the statute runs directly counter to the public policy that parents, not the State, should support their children. It is highly unlikely that the Legislature would, by inference, permit such an easy evasion of this responsibility. See *White* v. *Laingor*, 434 Mass. 64, 65 (2001) (where no judicial determination that its terms advance best interests of child, agreement to exchange parental rights for reduction in child support payments unenforceable).[7]

*Conclusion.* The order of the Juvenile Court granting the child's motion for support is affirmed.

*So ordered.*

---

[7]The father cites cases from several other jurisdictions in which a termination of parental rights has been held to terminate parental obligations. However, the holdings in those cases are often based on details of the State's statute that differ from ours. Moreover, in every case cited by the father, there has been judicial involvement in the termination, a process that G. L. c. 210, § 2, does not afford. See *County of Ventura* v. *Gonzales*, 88 Cal. App. 4th 1120, 1122 (2001); *In re J.L.W.*, 496 N.W.2d 280, 282 (Iowa Ct. App. 1992); *Roelfs* v. *Sam P. Wallingford, Inc.*, 207 Kan. 804, 811 (1971); *McCabe* v. *McCabe*, 78 P.3d 956, 960 (Okla. 2003); *Kauffman* v. *Truett*, 771 A.2d 36, 38 (Pa. Super. Ct. 2001); *Coffey* v. *Vasquez*, 290 S.C. 348, 350 (1986); *State ex rel. B.M.S.* v. *H.J.*, 65 P.3d 639, 642 (Utah Ct. App. 2003); *Commonwealth ex rel. Spotsylvania County Dep't of Social Servs.* v. *Fletcher*, 38 Va. App. 107, 112 (2002), aff'd, 266 Va. 1 (2003). Indeed, in at least one State, the presence of a court order terminating parental rights extinguishes the duty of support, but a voluntary surrender of those rights, standing alone, does not. See *Department of Human Resources* v. *Cowan*, 220 Ga. App. 230, 231 (1996); *Department of Human Resources* v. *Ammons*, 206 Ga. App. 805, 806 (1992).